Rob RECK, Appellant,

v.

MISSOURI DEPARTMENT OF MENTAL HEALTH, Respondent.

No. WD 68819.

Missouri Court of Appeals, Western District.

June 17, 2008.

Howard C. Gosnell, Jr., Kansas City, MO, for Appellant.

Bruce E. Hahn, Kansas City, MO, for Respondent.

Before JAMES EDWARD WELSH, P.J., PAUL M. SPINDEN, and ALOK AHUJA, JJ.

JAMES EDWARD WELSH, Presiding Judge.

Rob Reck appeals the circuit court's judgment affirming the Missouri Department of Mental Health's decision that he committed one count of Class I neglect and 59 counts of Class II neglect in violation of 9 CSR 10–5.200(1) while working as Director for Specialized Support Services. Reck contends: (1) the Department's decision that he committed one count of Class I neglect was not supported by substantial and competent evidence, (2) the Depart-

ment's decision that he committed 59 acts of Class II neglect under 9 CSR 10–5.200(1)(B) is contrary to law, (3) the Department's decision that he committed 59 acts of Class II neglect is not supported by substantial and competent evidence, and (4) the Department's decision that he committed one count of Class I neglect and 59 counts of Class II neglect is arbitrary, capricious, and unreasonable. We affirm.

The Kansas City Regional Center (Center) is a Department facility that contracts with community agencies to provide services to persons with mental retardation and developmental disabilities. The Center also investigates allegations concerning abuse, neglect, or misuse of funds or property by community agency employees and determines whether or not those allegations are substantiated. Specialized Support Services (SSS) is one of the community agencies which contracts with the Center to provide services to the Center's consumers.

On January 1, 2005, Reck became the Director for SSS in Kansas City. During Reck's tenure as Director, SSS provided residential services for two of the Center's consumers, J.R. and L.J., during February and March 2005. J.R. and L.J. were roommates in an individualized supported living unit. As Director, Reck was responsible for the scheduling of adequate staff at the living unit where J.R. and L.J. lived, for ensuring that staff received appropriate training, and for ensuring that necessary services were delivered to J.R. and L.J. in accordance with the requirements of their person centered plans.

According to J.R.'s person centered plan, J.R. required 24 hour supervision to maintain his safety and the safety of others in his community. The plan required that J.R. receive one-on-one direct supervision by a staff member during the day and required supervision by one "awake staff"

for every two consumers during the night to prevent elopement. The plan also required that J.R. receive supervision by an all male support staff and that those staff members receive training in MANDT, which is a method used to safely intervene and restrain aggressive individuals. The staff members had to be current with MANDT training and be capable of using MANDT approved techniques if J.R. became aggressive.

L.J. had two person centered plans: one effective prior to March 1, 2005, and the other effective after March 1, 2005. L.J.'s plans required one-on-one staff support throughout the day due to L.J.'s lack of impulse control and his inability to process anger and feelings of aggression. The plan also required that all staff members have MANDT training and be capable of using MANDT approved techniques if L.J. became aggressive.

According to SSS's staffing patterns and the budget plans for J.R. and L.J., two staff members were required to work in J.R.'s and L.J.'s living unit from 7:00 A.M. to 11:00 P.M. daily, and one staff member was required to work from 11:00 P.M. to 7:00 A.M. daily. In February and March 2005, because of staffing issues, Reck decided to change the staffing schedule in J.R.'s and L.J.'s living unit. At the hearing, Reck admitted that he changed the staffing schedule for J.R.'s and L.J.'s living unit and that, as a result of the change, he failed to provide the level of staffing required for at least one hour of each day for J.R. and L.J. According to Reck:

> We simply didn't have enough bodies to cover every hour on our budget. So I decided to reduce staff hours, usually from seven to eight or nine in the morning and from nine until eleven at night. I figured if we must squeeze out hours, those are the least vulnerable to acting out.

Reck failed to provide the level of staffing required by J.R.'s and L.J.'s person centered plans for 28 days in February and 31 days in March.

On February 6, 2005, Reck scheduled a female staff member, Stephanie Westbrooke, to work at J.R.'s and L.J.'s living unit. Between 8:00 A.M. and 8:30 A.M., when two staff members should have been at the living unit, Westbrooke was the only staff member present. Westbrooke also was not trained in MANDT. While Westbrooke was working that morning, a fight broke out between J.R. and L.J., which lasted 30 to 45 minutes. During this fight, J.R.'s television set was broken, and L.J. tried to put his hand through a wall. Westbrooke was unable to stop the fight. The fight ended when a male staff member came on duty and stopped the fight. No one was injured as a result of the fight.

On October 5, 2005, after conducting an investigation into concerns about the possible abuse and neglect of J.R. and L.J., the Center's Regional Director, Jerry Carpenter, made a preliminary determination concluding that, pursuant to 9 CSR 10–5.200, Reck had committed one count of Class I neglect due to his failure to assign appropriate staff to care for J.R. and L.J. on February 6, 2005, and 59 counts of Class II neglect due to his failure to schedule adequate staff at J.R.'s and L.J.'s living unit in February and March 2005. Carpenter advised Reck that, before he made his final determination, Reck had the right to either meet with him or submit comments to him to present any evidence that Reck felt was not considered. Reck met with Carpenter on October 19, 2005. On October 28, 2005, Carpenter issued his final determination substantiating one count of Class I neglect and 59 counts of Class II neglect. Carpenter also informed Reck of his right to appeal[1] the determination to the Department's Hearing Administrator.

Reck requested a hearing before the Department's Hearing Administrator, who held a hearing on August 15, 2006. On August 21, 2006, the Hearing Administrator issued its decision affirming the decision of the Center's Director and concluding that one count of Class I neglect and 59 counts of Class II neglect as described by 9 CSR 10–5.200 were substantiated against Reck. Reck filed his petition for judicial review in the Circuit Court of Cole County on September 20, 2006, and the circuit court affirmed the Department's decision on April 6, 2007. Reck appeals.

In considering Reck's appeal, we review the Department's decision and not the circuit court's judgment. *TAP Pharm. Prods. Inc. v. State Bd. of Pharmacy*, 238 S.W.3d 140, 141 (Mo. banc 2007). We review the Department's decision by determining whether or not substantial and competent evidence supports the decision, whether or not the decision is arbitrary, capricious, or unreasonable or involves an abuse of discretion, or whether or not the decision is unauthorized by law. *Id.* at 142; § 536.140.2, RSMo Cum.Supp.2007.

■ In his first point on appeal, Reck asserts that the Department's determination that he committed one count of Class I neglect was not supported by substantial and competent evidence. He contends that J.R. and L.J. were not exposed to either a risk of imminent danger or to a substantial probability of physical injury as of result of his failure to assign appropriate staff to care for J.R. and L.J. on February 6, 2005. We disagree.

The Department's regulation defines "Class I neglect" as the "failure of an employee to provide reasonable or necessary services to maintain the physical and mental health of any consumer when that failure presents either imminent danger to the health, safety or welfare of a consumer, or a substantial probability that death

or physical injury would result[.]" 9 CSR 10–5.200(1)(A).

The evidence established that Reck scheduled Westbrooke to work alone with J.R. and L.J. for 30 minutes on the morning of February 6, 2005. Westbrooke is a female, and she is not trained in MANDT. The person centered plans for both J.R. and L.J. required that each have an individual staff member supervising them throughout the day. According to J.R.'s person centered plan, J.R. required 24 hour supervision to maintain his safety and the safety of others in his community. L.J.'s plan required one-on-one staff support throughout the day due to L.J.'s lack of impulse control and his inability to process anger and feelings of aggression. J.R.'s and L.J.'s plans also required that all staff members working with them have MANDT training and be capable of using MANDT approved techniques if J.R. or L.J. became aggressive. Moreover, J.R.'s plan required that J.R. receive supervision by an all male support staff due to J.R.'s history of sexual inappropriateness with vulnerable persons, children, and females.

Reck's decision to schedule an employee, who was not trained in MANDT, who was not trained to handle consumers when they became aggressive, who was a female, and who was the only employee scheduled to supervise J.R. and L.J. on the morning of February 6, 2005, was a failure to provide reasonable or necessary services to maintain the physical and mental health of J.R. and L.J. Such decision presented an imminent danger to the safety of J.R. and L.J. and a substantial probability of physical injury. While Westbrooke was working alone with J.R. and L.J., J.R. and L.J. began fighting. Westbrooke was unable to intervene and stop the fight. She was not trained in MANDT so she did not know how to appropriately intervene and defuse the situation. The fight between J.R. and

L.J. continued for 30 to 45 minutes and lasted until a male staff member came on duty and stopped the fight. That no one was injured does not excuse Reck's failures. A substantial probability existed that either J.R. or L.J. could have been injured as a result of the fight. The staffing requirements for J.R. and L.J. were established to prevent this type of incident from happening, and Reck was responsible for protecting J.R. and L.J. by assigning the appropriate staff to care for them. Substantial and competent evidence supported the Department's decision that Reck committed Class I neglect.

 In his second point, Reck contends that the Department's decision that he committed 59 acts of Class II neglect under 9 CSR 10–5.200(1)(B) is contrary to law because the regulation exceeds the authority granted by sections 630.155, RSMo 2000, and 630.170, RSMo Cum. Supp.2007. Indeed, "an administrative agency enjoys no more authority than that which is granted to it by statute," and an agency may promulgate regulations "only to the extent and within the delegated authority granted to it by statute." *Pen–Yan Inv., Inc. v. Boyd Kansas City, Inc.*, 952 S.W.2d 299, 303–04 (Mo.App.1997). "Regulations which exceed the authority granted the promulgating agency are null and void." *Id.* at 304.

Regulation 9 CSR 10–5.200(1)(B) defines Class II neglect as:

[The] failure of an employee to provide reasonable or necessary services to a consumer according to the individualized treatment or habilitation plan, if feasible, or according to acceptable standards of care. This includes action or behavior which may cause psychological harm to a consumer due to intimidating, causing fear or otherwise creating undue anxiety[.]

Reck asserts, however, that, according to section 630.155.1(4), the statutory definition of "neglect" requires a finding that, if an employee failed to provide reasonable and necessary services, such failure must present an imminent danger to the health of the consumer or a substantial probability that death or serious physical harm would result.

Indeed, section 630.155.1(4) says:

A person commits the crime of "patient, resident or client abuse or neglect" against any person admitted on a voluntary or involuntary basis to any mental health facility or mental health program in which people may be civilly detained pursuant to chapter 632, RSMo, or any patient, resident or client of any residential facility, day program or specialized service operated, funded or licensed by the department if he knowingly does any of the following:

. . . .

(4) Fails to provide services which are reasonable and necessary to maintain the physical and mental health of any person, patient, resident or client when such failure presents either an imminent danger to the health, safety or welfare of the person, patient, resident or client, or a substantial probability that death or serious physical harm will result.

This particular statute, however, defines neglect for criminal offenses. Section 630.155.2 says that neglect committed under section 630.155.1(4) is a class D felony.

The General Assembly, however, authorized the Department to promulgate rules "setting forth reasonable standards for residential facilities and day programs for persons who are affected by a mental disorder, mental illness, mental retardation or developmental disability." § 630.705.1, RSMo 2000. Moreover, the General As-

sembly instructed the Department to "design the rules to promote and regulate safe, humane and adequate facilities and programs for the care, treatment, habilitation and rehabilitation of [these] persons" and to "promulgate reasonable rules relative to the implementation of patient, resident and client rights[.]" §§ 630.705.2, RSMo 2000, and 630.135, RSMo 2000.

Pursuant to that authority granted to it by the General Assembly, the Department promulgated 9 CSR 10–5.200(1)(B) regarding Class II neglect. That the regulation does not track the definition of neglect for a criminal offense and require an imminent danger to the health of the consumer or a substantial probability that death or serious physical harm would result is of no consequence. The General Assembly authorized the Department to promulgate regulations to assure safe and humane care and treatment for a consumer, and the Department did this by promulgating 9 CSR 10–5.200(1)(B) and providing consequences for an employee's failure to provide reasonable or necessary services according to a consumer's individualized treatment plan.

Section 630.170.9 says:

The department may maintain a disqualification registry and place on the registry the names of any persons who have been finally determined by the department to be disqualified pursuant to this section, *or who have had administrative substantiations made against them for abuse or neglect pursuant to department rule.*[1]

This statute contemplates that the Department will have rules regarding abuse and neglect separate from the criminal offense for neglect. The Department's decision, therefore, that Reck committed 59 acts of Class II neglect under 9 CSR 10–

---

1. We added the emphasis.

5.200(1)(B) is not contrary to law and does not exceed the authority granted by sections 630.155 and 630.170.

■ In his third point, Reck contends that the Department's decision that he committed 59 acts of Class II neglect is not supported by substantial and competent evidence. In particular Reck asserts that the reductions in the hours of supervising staff for J.R. and L.J. did not constitute a failure by him to provide reasonable or necessary services to either J.R. or L.J. according to their individualized treatment plan or according to acceptable standards of care. We disagree.

Reck argues that, because the budget plans—and not the person centered plans—for J.R. and L.J. set forth the specific hours for which a particular level of staffing was required, no evidence existed that Reck failed to provide the necessary care or services for J.R. and L.J. according to their individualized treatment or habilitation plan. Reck fails to appreciate, however, that J.R.'s and L.J.'s person centered plan specifically required that they receive one-on-one direct supervision by a staff member during the day.[2] Several of the reduction in hours of supervising staff for J.R. and L.J. occurred during daylight hours of the morning.

Further, to the extent that Reck is contending that the Department could not refer to the budget plans to determine the staffing needs for J.R. and L.J., we are not persuaded. The approved staffing for J.R.'s and L.J.'s living unit, which was set forth in the budget plans, required that two staff members be present at J.R.'s and L.J.'s living unit from 7:00 A.M. to 11:00 P.M. According to the Director of the Center, the person centered plan defines what the support needs of the consumer are, and the budget plan indicates the staffing pattern an agency must provide to meet a consumer's needs. Indeed, SSS and Reck, as Director of SSS, agreed to provide the staffing and support for J.R. and L.J. as set forth in J.R.'s and L.J.'s budget plans.

As director of SSS, Reck was responsible for scheduling staff to meet the needs of J.R. and L.J. Reck made the decision and admitted that he scheduled staff for less than the approved hours in J.R.'s and L.J.'s budget plans during the months of February and March 2005. On some occasions, Reck did not adequately staff J.R.'s and L.J.'s living unit from 7:00 A.M. to 9:00 A.M., and, on other occasions, he did not adequately staff J.R.'s and L.J.'s living unit from 9:00 P.M. to 11:00 P.M.

Reck asserts, however, that 9 CSR 10–5.200(1)(B) recognizes that circumstances may exist when an employee may be required to deviate from a consumer's individualized treatment plan. Indeed, the regulation says that an employee commits Class II neglect if he or she fails to provide reasonable or necessary services to a consumer according to an individualized treatment plan, "*if feasible.*" 9 CSR 10–5.200(1)(B). Reck contends that his decision to reduce staffing was due to the

---

2. L.J.'s plan is inconsistent as to whether L.J. needs one-on-one supervision at all times or during the day only. At different points in L.J.'s plan, it says: (1) L.J. "requires 1:1 staff support due to his lack of impulse control and his inability to process anger and feelings of aggression," (2) L.J.'s "unpredictable behavior and poor impulse control continues to support the need for 1:1 staff *at all times,*" (3) L.J.'s "unpredictable behavior and poor impulse control continues to support the need for 1:1 staff throughout the day," (4) L.J. "will be maintained on a 1:1 staff ratio during awake hours." The Department, however, concedes that L.J.'s plan required that he receive one-on-one direct supervision by a staff member during the day and required supervision by one "awake staff" for every two consumers during the night.

limited number of staff working for SSS during this time because several employees had quit or their employment with SSS had been terminated. The evidence showed, and the Hearing Administrator expressly found, however, that Reck could have paid employees overtime, possibly used outside agencies for temporary staff, or could have gone back to the Center and sought approval for revising the staffing needs for J.R.'s and L.J.'s living unit. Reck did none of these.

Although Reck characterizes his deviation from staffing levels as "brief," 59 different deviations is not brief. This is not a circumstance where adequate staffing was not provided on a few unexpected occasions. This was a conscious decision on Reck's part to not provide adequate staffing for J.R.'s and L.J.'s living unit on 59 separate occasions. Substantial and competent evidence supported the Department's decision that Reck committed Class II neglect when he failed to provide the staff coverage necessary to meet J.R.'s and L.J.'s needs as required by their person centered plans and implemented by their budget plans.

In his final point, Reck asserts that the Department's decision that he committed one count of Class I neglect and 59 counts of Class II neglect is arbitrary, capricious, and unreasonable. In particular, he contends that: (1) when he made the decision to reduce the staffing hours for J.R.'s and L.J.'s living unit, the Department was aware of these reductions and did not object to his decision; (2) the Department did not remove J.R. or L.J. from the living unit or take any action for approximately nine months on the alleged charges; (3) he was not the employee responsible for arranging MANDT training for employees; and (4) he had only been Director of SSS for one month before the incidents at issue occurred, and he had not had sufficient time to review employee training schedules. But, even if all of these alleged circumstances were true, Reck fails to appreciate that he was the person ultimately in charge. As Director of SSS, he was responsible for insuring that J.R.'s and L.J.'s living unit was adequately staffed and that the staff members he assigned to work at the living unit were adequately trained. He, therefore, was responsible for any failures to provide reasonable or necessary services to J.R. and L.J.

Moreover, Reck's claim that the Department did not object to his staffing reductions is also inconsistent with the evidence and the Hearing Administrator's findings. Three meetings occurred between December 2004 and March 2005 at which the Center's quality enhancement team reminded Reck of the need to follow the required staffing patterns and the need to file event reports for any occasions on which staffing patterns were not followed. Reck did not submit any event reports for February or March 2005. The Department's decision that Reck committed one count of Class I neglect and 59 counts of Class II neglect was not arbitrary, capricious, and unreasonable.

We affirm the circuit court's judgment.

All concur.